Thank you for the opportunity to appear here. My name is Eric Seitz and my associate is Della Bellotti. I appreciate the opportunity to talk to you this morning. I'd like to try to reserve two minutes of my time. We'll see how that goes. As far as we're concerned, there's really only one issue in this appeal and that is whether Judge Graber's majority opinion in the Alfred case is positive here. I don't intend to argue any of the other claims with respect to this appeal. I think the negligence claim is the only one that we would still pursue in light of Judge Curran's orders and that is the basis for this appeal. And we believe quite clearly that Alfred is not dispositive here. Now as you recall, there's a two-part test that was adopted by the Ninth Circuit, which Judge whether or not the challenged conduct is discretionary and secondly, if so, whether the judgment that was exercised in this case is of the nature or kind that the discretionary exception was designed to shield. In Alfre, clearly there were choices. A report of a threat was made from one inmate to another threat, to another inmate, obviously a very serious threat, but the officials deciding how to respond to that threat had a number of choices, not the least of which was they could have separated the inmates, they could have conducted investigation, they could have done all kinds of things, or they could have basically ignored it to see if something further happened. Obviously in an institutional setting like this, there are threats and complaints. Inmates don't have a lot of time on their hands to do anything but often make complaints and so clearly there was some discretion on the part of the prison staff in that case about how to handle the complaint and the threat that was reported to them. And regrettably, the threat was true, but that was clearly a case in my view, and I think that case was correctly decided, regrettably because of the outcome, of what we call Monday morning quarterbacking. Well, unfortunately all of these cases involve potentially very valid claims not going forward. That's right. And this one in particular has very egregious facts involved. How do you distinguish United States versus nurse or nurse versus United States? I can never remember the order in which the names appear, which essentially seems to imply because of the discretionary function exception. And just speaking for myself, I have some question about whether that exception makes any sense, but it seems to me that the cases are pretty clear that it exists. How do you distinguish those? I don't distinguish those, Judge Graber. What I basically am saying to you is that as far as training and supervision is concerned, those claims are beyond our reach in this case. Okay. Well, all we have here is a negligence claim against the government by virtue of the actions. The actions at the moment, where he leaves them in the closet, where he allows the closet door to close. That's correct. So if that's right, counsel, can you help me out? Once the closet door closes, why is Mr. Cruz, was Mr. Cruz not in the same position as the folks in Alfrey, where he had to make a decision about competing supervisory concerns? There's an inmate with access to tools, right? And then there was an inmate in a closet. I'm getting there. Let me, that's where I am right now with respect to distinguishing Alfrey. In this case, it's our position that there was no discretion whatsoever, and that when Mr. Cruz allowed a female inmate to be accompanied into that closet, unsupervised by a male staff member, that that was a decision that should never have been made. There are no circumstances where discretion in that situation should have been allowed, unless there were a riot or a fire or something of that nature, perhaps, that made this an emergency. Under no circumstances in 2007 should a correctional guard have allowed a female inmate within his custody and control to be exposed to the inherent unsupervised place with a single male staff member. So Mr. Cruz should have then done what? He should have forced the door open and had them come out. He should have prevented them from going in the first place. He should have called for another guard. What is it that Cruz was obligated to do? He should not have allowed that to happen, and he either should have said to the individual making the request, no, we can't do that until somebody can go with you, because there was no urgency to do it at that time. He should not have allowed that situation to even exist. And that is the gist of our argument. And it's not just for the safety of the inmate. It's commonsensical, because for both parties involved, we all know and they all know that when you create a situation where a female inmate is with a male guard, the female inmate is just as likely to fabricate a charge of misconduct which cannot be defended by the guard. And that happens. And the staff are instructed, don't ever put yourself in that situation. It is clearly a commonsensical determination that under no circumstances should Mr. Cruz have allowed that situation to occur. It isn't a question of whether or not he should have broken down the door or walked in or made a choice about whether or not to continue to supervise the remaining members of the crew or to allow this to have occurred. He should not have allowed it from the start. He should have called for help, and he should have told the electrician at the time that, Mr. Millsap, I'm sorry, I cannot accommodate you in this situation. It's not a situation that I can allow to occur. And that's based upon a number of factors. First of all, as I say, it's based upon common sense and the experience of people in corrections. Secondly, we have a statute that was passed in 2003. Now, admittedly, the government points to the fact that there were no administrative rules implementing that statute, but we certainly have a common awareness that sexual abuse occurs in institutions, especially between staff members of one sex and inmates of another sex, which has to be prevented. It's criminal. And everybody knows that. We don't have male staff members frisking or strip searching female inmates. There are all kinds of things that occur which arise because of a consciousness, a heightened consciousness, of the security of inmates in those circumstances. And Cruz, even though in his deposition said, well, I thought about it, but I wasn't sure what my responsibilities are, had to have known, has to be charged with having known that in a situation like this, where our client could not have refused, was at his obligation not to put her in that kind of a situation. And that is the negligence which we submit underlies this case. Could I just follow up on the comment that you just made, that your client was at the mercy of Cruz. Am I right that the electrician first went to her cell and asked her to show, I think, the burn on her abdomen, and she refused? Yes. That's correct. But you just said she was not able to refuse Cruz. So could you help me out? Well, the electrician, first of all, was not somebody who had direct responsibilities over her. So somebody comes in and says, show me a part of your body, there was no obligation. She could not have been written up for doing that. So that's really my question. That wouldn't have been a violation for the prisoner to have refused the electrician, but certainly to refuse a direct order from a guard. That's right. Yes. All right. That's right. That's something for which she could have been disciplined. Thank you. So essentially what I'm suggesting to you is, first of all, this is not in the first case, there was no discretion here in our view. And secondly, equally importantly, if not more so, this is not the kind of discretionary determination that the exception was designed to permit. There is no indication, there's nothing to suggest that in this situation, Congress ever intended for this kind of situation to be subject to the kind of protection which the This is something for which our client ought to be allowed to pursue her negligence claims based upon typical tort concepts to demonstrate that there was a duty owed to her, there was heightened responsibility here because of the rape relationships, that there was negligence, that the kind of injury she received was foreseeable, and if we got before a finder of fact, perhaps we would debate the foreseeability issue, but that's a finder of fact determination, and that she was damaged. Counsel, oh, forgive me, I didn't mean to interrupt, please. Please. Oh, I beg your pardon, that wasn't my intention. You've made clear in response to Judge Graber's question that you're not proceeding under a negligent training or supervision theory. Yes. So I need to know, are you proceeding just under the count seven, which you claim, I think, to be a claim for general negligence? Yes. And the court, I think your briefing, your position is that the court misunderstood that to be just a claim for damages. Yes. All right. It misunderstood it because we incorporated all of the factual allegations in there, and we did make allegations of negligence. All right. So for purposes of this appeal, we're not looking at one through six? You are not looking at those other counts. I think we have problems with the discretionary exception as to some of those counts, and we have problems of proof with respect to the deliberate indifference allegations against Cruz.  Nilsap is no longer in the case. He settled after he pled guilty and went to prison. If you're just limiting yourself to a negligence claim against Cruz, what is the basis of the claim? If it's not negligent supervision, what is it? The negligence against Cruz is that negligent, first of all, it's not really against Cruz. It's against the government. The government was negligent. The actor of the government who negligently acted, or omitted to act in this case, was Mr. Cruz. The government's negligence is always through its agents, its employees, or its representatives. In this case, Mr. Cruz acted in the scope of his duties, and he was negligent, and our client got hurt. And that's simple. Right, but he was negligent because he was a supervisor, right? No, he was negligent because he wasn't a supervisor. He was a line guard who basically made the decision to put our client at risk. And what I'm saying is, first of all, that was a non-discretionary decision. That what he did, he should not have done under any circumstances. And that by making that decision, my client was injured, and that that was the government's responsibility. He was not a supervisor. What would have happened if he hadn't shut the door? I'm understanding you just say in response to my question about Alfre, that what put him in the position of having to choose between competing priorities is that he allowed the door to shut. So, and that you're telling me he should never have done that. Yes. All right, so what would have happened if he had said, can't help you? Nothing would have happened. I think Mr. Millsap would have had to go and find somebody else to help him if he wanted to go take this woman to examine this piece of equipment. And in theory, at least, there would have been, hopefully, a female guard or a female staff member that accompanied them into that place. But at least two men, another person to supervise. So that wouldn't have represented any kind of a competing concern or priority, would just have had to wait. Is that your position? Is that right? Yes. All right. And there's no reason why they couldn't wait. There was no urgency about doing this, other than Mr. Millsap wanted to do it then. And you can surmise that he was upset that my client wasn't more cooperative with him, but that's not really part of our proof here. Essentially, what happened here was that he forced the issue, and Cruz basically allowed it to occur, and my client got hurt. And we don't believe from ab initio that that should have happened. And if you have no further questions, I will- You may save the two and a half minutes for rebuttal from the government. May it please the court? I'm Anne Murphy, representing the United States. Could you speak a little louder, please? Sure. I'm Anne Murphy, representing the United States. And, Your Honor, I think both parties agree that the issue here, now that the issues have been definitively narrowed in this appeal, whether Officer Cruz had discretion over his choices at that time, and whether those choices were the kind of choices that are subject to discretionary- What would the answer be if the danger in the closet were not another person? For example, suppose she had been ordered to go into a closet where there was a downed live electrical wire, or a fire, or something. Would there be immunity from that sort of decision? Well, Your Honor, I'm assuming, I have to go on the basis of not understanding what BOP policies or regulations might cover that kind of situation. And I'm sure that- Well, let's assume that they don't. I mean, there's some common sense involved here. In my hypothetical, let's assume he knows that there's a fire in the closet. And he says, go in the closet, and I'll let the door shut behind you. And she's burned. So there's no third party intervention here. Is that a situation in which there could be liability on the part of the government? It's quite possible that the government wouldn't assert the discretionary function exception in such a case for some reason. Because that seems very different here. I know that we're not looking at the merits, we're looking at the discretionary function exception. But it is kind of relevant here in a broader sense, that there was no knowledge of any sort. You posited your hypothetical on the view that somebody would have known it was dangerous. There's no knowledge on the part of the United States that Mr. Milsap was a threat. He had no record of that. Well, isn't that really the crux of the question then? Because it sounds like you would agree that there's no discretion to put an inmate directly and knowingly into the path of physical injury. And so the question then is, how much does one have to know? It makes it more difficult when it's a person, because they have their own independent acts. It does, and when the act is an intentional tort, which historically was because it's so unforeseeable. But nobody's going to hire a prison guard who they know is going to pose a hazard to the inmates. And Mr. Milsap was trained as a prison guard, he was trained in the policy, which is that it's a very clear mandatory policy of not having any kind of sexual relationship with the inmates. And one of the things that was meaningful to Officer Cruz was that plaintiff was not unsupervised in the closet. Mr. Milsap had the same training that he did, and Officer Cruz didn't know he testified, and there's really no counter to this. It was clear to him he didn't see it as a threat at all. To let plaintiff go into the office. We know with the benefit of hindsight that he was wrong, but it's not that there was anything being done here apart from Officer Cruz weighing two separate risks. Well, yet Officer Cruz testified that he had been trained, that it was at least strongly recommended to never let a prisoner go alone into an area, I think, off camera, is what he said. Doesn't that really go to Judge Graber's point that this is all a continuum of how much do you have to know? We know sexual assaults sometimes occur in prison, as counsel was just explaining. Right, but the question here is, it's a discretionary function question. Did he have discretion to do it? And I think Judge Graber's saying, well, are there some circumstances where there's some things that just fall off the scale? I don't think we're anywhere near that in this case. Well, is there ever discretion to... It sounds like, for my way of thinking about it anyway, that there's no discretion knowingly to put someone in the path of physical injury. But the problem here is the knowing part. How much... You can't tell someone to go, you know, hold onto a live wire or jump into the fire. That's clearly... There's no discretion to do that, to put someone in harm's way in that direct way. And I guess, to me, what's difficult is figuring out where to draw that line, and how much does one have to know to lack discretion to do the act. I understand, and I think the district court got it right here, because the district court did take the evidence, it got the depositions, and it concluded that, in this case, given Officer Cruz's training, Mr. Millsap's training, the fact that... And it was fairly fact-dependent. There was the other inmate cut, with the inmates that needed to be supervised and the tools, and Officer Cruz didn't think that there was any risk at all from plaintiff going to the closet. Well, that's the key, because if he thought there was a risk, if it were the obvious danger kind of situation, it wouldn't matter whether there was somebody else. He would have just told them not to do it, which is counsel's position. Just, you have to wait. Right, although one of the reasons I was hesitant is I think, generally, there are mandatory policies against things that are clearly putting inmates at risk of harm, which is why I hesitated on your first question as to whether that would be a discretionary function kind of case. But in this case, I think the district court was right to say that there's a general duty of responsiveness, and that under the situation that faced Officer Cruz here, as in Alfrey, as in Bailey, he was choosing between different, you know, different parts that implicated safety. Well, it was after the door shut, but I'm trying to get you, and I think Judge Graber's trying to get you to focus on about one minute earlier than that on the sequence of events, because prior to that time, why was there a competing safety interest? My understanding is there would just have been a need to wait. That's correct, but the question for the discretionary function purpose is, you know, was there discretion? Did he have a choice? And the answer is yes, he did, and the district court found that. Well, it has to be a legitimate choice. I mean, that's why I was asking you the questions I was asking you, because you have a choice whether to tell someone to grab the live wire or jump into a fire, but it's not a legitimate choice because you can't go tell somebody to go hurt yourself. So that's why I'm focusing on what was known or knowable before they went into the closet. Right, and that's why, I mean, the truth is that in this case, the things that Officer Cruz knew were, you know, Millsap had had the same training. There was no, I mean, as far as Officer Cruz knew and it was untrue, there was no issues about Mr. Millsap. He'd supervised inmates for years. He was a trained BOP employee, and they were going into the closet to make a routine identifying and identification. How large was this closet? I think not, there's an entranceway and then a closet. Large enough to hold buffer machines. The buffer machines, at least in my experience, are pretty good sized. Right. It's not like an upright vacuum cleaner. Right, but the situation facing Officer Cruz was, somebody's asking to do an identification of the buffer because he has a work order he needs to prepare it, and he's got the work crew there. So it's kind of one of those judgments that the officer had to make in the moment at the time. And he didn't see a risk from letting Mr. Millsap just take, kind of, into the closet long enough to identify a floor buffer. And there's a clear risk from the inmate with the tools. They were in the female housing unit, and Officer Cruz determined that he would, you know, walk away from the closet and supervise the male inmates. And, you know, again, with the benefit of hindsight, that seems like a terrible decision to make, but at the time it's not at all clear that it was even a bad decision given what Officer Cruz knew and what was facing him about the very clear risk from the inmates. And I agree another choice would have been he could have waited, but, again, that's where the notion of having a mandatory policy, something that you can't do, comes into play with the discretionary function. And it's undisputed in the record. And there's, you know, nobody's saying that there was a mandatory requirement. And even under the PREA... Well, what do you make, I'm looking at, well, there's so many page numbers, I don't know quite how to describe it, but it's the FBI report, page three of that report. Cruz recalled being told not to go in any room off camera with a female by instructors and other COs. So regardless of what he thought that this third person thought, why isn't that enough of a mandatory instruction to pass over your threshold? Well, your Honor, there's a couple of things. First of all, even Alfrey recognizes that the fact that somebody thinks that something's a rule doesn't make it a rule. So that's not a rule? You're saying that he's wrong, that he should be able to go off camera with a male and a female? Yes, Your Honor, at page 109 of volume two, where they're clarifying it with him at his deposition. He says it's a strong suggestion, but it's not that you have to do it. Which of the pages on 109? I'm sorry, there's four little pages. 25. Okay, thank you. It's 25, and it's the thing in the middle. He went through the same training I did, so it was just a suggestion, a strong suggestion. And even now under the PREA, where we do have a final rule now under the PREA, and that's supervision and monitoring, it's the agents. Again, it gives discretion to the prisons, because there's always going to be blind spots, even if you have video cameras everywhere. And they let the prisons make their own determinations in light of numerous factors as to what the rules are going to be with respect to supervision of the inmates. I just want to make absolutely clear at this point that there is a zero tolerance policy, and that it's no part of our argument that anyone has discretion to assault an inmate. It's just that under the circumstances that happened here, which were really entirely unforeseeable as far as everybody, except I suppose Mr. Millsap was concerned, that it wasn't a proper exercise of discretion that was conferred on us. Counsel, in response to my question, Mr. Seitz said that the only one that he wants, the only count that he is pursuing at this point is count seven, and that he characterized that count as being a general negligence, but not a claim of negligent supervision. Is there room there for Mr. Seitz to stand? Is there room there for... Is there enough room there for Mr. Seitz to stand on that argument? Can this be anything other than a supervision argument? No, he's made it very clear. Well, Officer Cruz wasn't really a supervisor. He's right about that. He's made it very clear, because he said earlier this morning, that the basis of the claim is the actions by Officer Cruz, and that's all that they're talking about. And our point is that the district court was entirely right, based on the record that it compiled, that in fact there was discretion over how Officer Cruz would respond to the situation. Okay, Officer Cruz was not a supervisor? No, he was the... He was not a supervisor. He was the gentleman who was the officer in charge of the day. He wasn't a supervisor in the sense of having employees report to him, but I think I had understood one of the counts that now isn't in the mix, that it was also that he was, quote-unquote, supervising Mr. Millsap. But that is not the claim at this point. Well, it's also not really a correct characterization, because again, in that very same paragraph we were looking at before, Officer Cruz and Mr. Millsap, although Mr. Millsap was the electrician, he was also a BOP-trained employee, who had had all of the same officer training that Officer Cruz had had. And that was a significant part of Officer Cruz's understanding that the plaintiff was not in any danger, because Millsap had had the same training that he had. I thought part of the government's argument was that Cruz had to make a decision between sort of going in the closet and hauling Millsap and the victim out, or standing and watching the other folks who were working in the area who had tools. No, the decision, as the district court said at page 15 of Volume 1, the conduct that's being complained of is Officer Cruz allowing Millsap and plaintiff to go into the closet. If he's not a supervisor, how is it that he's allowing them to go in? He's unlocking the door. That's a good question. And I'm assuming that in circumstances that aren't here, for example, if BOP had said, if this particular facility had an absolute mandatory ban on any such thing, that Cruz could have said something about it. Well, it's more than that, though. Millsap didn't have the key to the closet. That's right. Cruz had the key. And as far as the record shows, he was the only one of all the people that were in the area and involved in this incident who had a key. So he allowed him, in the most literal sense, he let him into the room. He physically made it available. Well, and even more than that, my understanding, counsel, please correct me if I'm wrong, she refused to follow Millsap's direction. Doe did. And so the first sequence is that Officer Cruz retrieved the prisoner from the cell, right? Right. But Officer Cruz... Can I just follow up? Then am I correct to follow up on Judge Graper's question that it was also Cruz who had the key to the closet? Millsap didn't have either of those keys, right? That's right, because Officer Cruz was the on-duty person in the inmate's thing. But to be fair to Officer Cruz here, when Mr. Millsap asked the plaintiff, and she said, no, I don't want to talk to you or whatever she said, when Officer Cruz was asked to let her out to identify the floor, but he asked her, were you hurt? He confirmed that it was, in fact, her. And he asked her. He didn't just let go and do what Millsap said. So he's trying to make sure that plaintiff is actually the person that he needed to go and identify the floor, but... Is opposing counsel correct that she would have been subject to discipline if she had refused to go into the closet as directed by Cruz? I don't know the answer to that question, Your Honor. Thank you. I'm sorry. Thank you, counsel. Thank you. Mr. Seitz, you have a little bit of rebuttal time. Thank you. I want to make one what I consider to be significant point based upon the colloquy that just occurred. And that is that government counsel lapsed over on several occasions talking about foreseeability. And that's an entirely different analysis. That there are problems, obviously, under the Federal Tort Claims Act when the actual harm is caused by a criminal or intentional act of somebody and you're seeking to establish negligence on the part of another party to have allowed that to occur. But when you get past the discretionary exception and then you get to other issues which are purely tort issues, those are questions of fact. And foreseeability here would have been a question of fact. And the district court... Well, it kind of isn't. It kind of isn't. And I may be responsible for leading her astray in this regard because if the thing that happened was completely unforeseeable, then how could he have put her in harm's way? Well, I think you're right in that sense. But again, that's a different question. If it's like a bolt out of the blue, you know, you have a person who has never done anything wrong in their whole life and they go berserk or something that's completely unexpected or to go back to my other example, a fire breaks out after the person goes into the room and nobody knew it was going to happen. So in that sense, foreseeability or responsibility, perhaps is a better word, might matter. But only in a tort context. And again, that's different than this exception. So in other words, in your example, if Officer Cruz had no idea that he was exposing this person to a risk because of a fire or maybe an earthquake that occurs while she's in the closet, then as a question of foreseeability on a motion to dismiss, addressed to that issue, we could argue that. And we could pull in our experts and we could show that because there is such a heightened consciousness of sexual risks to inmates in situations where you have one male and one female, that it can't not be foreseeable. But we never got to that point. What we got to here was just a general analysis by Judge Curran. And he doesn't really, in my view, even analyze with any great depth your decision on which this whole thing is based. He basically assumes that this was discretionary without talking about what the options might have been. And that's what we're urging you to do here. Thank you, counsel. We appreciate the arguments of both counsel. They were very helpful in this difficult case. The case is submitted and we will stand adjourned for this morning's session.
judges: Graber, Bybee, Christen